**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Mar 04 2013, 9:43 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STEVEN J. HALBERT**
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF T.J.: | ) ) ) ) | |
| S.J., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A04-1207-JT-342 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellees-Petitioner, | ) ) | |
| and | ) ) | |
| CHILD ADVOCATES, INC., | ) ) | |
| Co-Appellee. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge

The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1201-JT-1040

**March 4, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

S.J. (Mother) appeals the involuntary termination of her parental rights to her child, T.J. Mother challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

Mother is the biological mother of T.J., born in December 2006.[1] The facts most favorable to the trial court's judgment reveal that in November 2004, the Marion County office of the Indiana Department of Child Services (DCS) filed a petition alleging that Mother's two older children, C.C. and J.R., were children in need of services (CHINS).[2] In the petition, DCS alleged that C.C. and J.R. were CHINS because Mother suffered from hallucinations and had been physically abusive to C.C. The petition alleged further that the Marion County Sheriff's Department had admitted Mother to a mental health treatment center because she was a threat to herself and others, and that there was no one available to

---

[1] The identity of T.J.'s father is unknown.

[2] We note that at some points in the record, J.R. is referred to as J.J. We note further that at the time of the termination hearing at issue in this appeal, J.R. was living with his father and C.C. had been placed in a residential facility. Mother's parental rights to J.R. and C.C. have apparently not been terminated, and we therefore limit our recitation of the facts pertinent to the juvenile court's termination of Mother's parental rights to T.J.

2

care for C.C. and J.R. at that time. After a series of hearings, C.C. and J.R. were adjudicated CHINS and formally removed from Mother's custody. At the dispositional hearing in that matter, the court appointed a public defender for Mother due to her "mental health issues and [her] behavior in Court[.]" *Exhibit Volume* at 9. The court also ordered Mother to participate in a variety of services, and the CHINS proceeding closed in 2007 after Mother completed services.

Mother again became involved with DCS in April 2011. At that time, DCS filed a petition alleging that then four-year-old T.J. was a CHINS because Mother had been incarcerated since September 2010[3] and T.J. had been living with various relatives since that time. T.J. had lived with an aunt since January 2011, but the aunt informed DCS that she was no longer able to care for T.J. An initial hearing was held on April 26, 2011, at which Mother did not appear due to her incarceration. The court appointed a guardian ad litem (GAL) for T.J., granted DCS temporary wardship over T.J., and maintained T.J.'s placement with her aunt. On May 16, 2011, the juvenile court conducted a continued initial hearing, at which Mother did not appear because she was still incarcerated. The court appointed counsel for Mother and entered a denial of the CHINS allegations on Mother's behalf, and continued T.J.'s placement with her aunt. A pretrial conference was held on June 6, 2011, at which counsel appeared on Mother's behalf and DCS informed the court that Mother remained incarcerated with a release date of July 21, 2011. The parties submitted stipulations that

---

[3] It appears from the record that Mother was incarcerated after violating her probation on a 2009 theft conviction.

Mother was incarcerated and therefore unable to appropriately parent T.J. The court accepted the stipulations, granted wardship to DCS, and set the matter for a dispositional hearing.

On June 27, 2011, the juvenile court conducted a dispositional hearing, at which Mother again did not appear due to her incarceration. As a result of the hearing, the trial court issued a dispositional order incorporating a Parent Participation Plan (PPP) directing Mother to successfully complete a number of tasks and services designed to address her parenting issues. Among other things, Mother was ordered to: (1) secure and maintain a legal and stable source of income; (2) obtain and maintain suitable housing; (3) participate in and successfully complete a home-based counseling program and follow any recommendations of the counselor; (4) complete a parenting assessment through Children's Bureau or Pleasant Run Children's Homes and successfully complete all recommendations developed as a result of the assessment; (5) complete a psychological evaluation as referred and approved by DCS; and (6) complete any current or subsequently handed down prison sentences and comply with any terms of probation and/or parole.

Mother was released from prison in July 2011. Upon Mother's release, Family Case Manager (FCM) Kelli Harrison made service referrals for Mother to do home-based therapy, a comprehensive mental health assessment, and supervised visitation. Mother began participating in supervised visitation and completed the mental health assessment with Christopher Houston of Dockside Services. During the assessment, Mother denied having a history of mental illness or being prescribed medications. Mother also stated that she did not

need mental health services and did not understand why she had been referred for a psychological assessment. Houston recommended that Mother see a psychiatrist for a medication review, but Mother did not follow through with his recommendation. Mother participated in home-based therapy for a short time, but services were terminated because of Mother's lack of engagement.

A review hearing was held on October 3, 2011, at which Mother failed to appear. Thereafter, Mother was arrested for a parole violation.[4] Another hearing was held on December 5, 2011, at which Mother did not appear due to her incarceration. DCS requested Mother's visitation be suspended because Mother was "verbally abusive and is in and out of jail and is not taking her medication for schizophrenic [sic]." *Exhibit Volume* at 51. Additionally, the GAL requested that T.J. be placed with her current foster mother. The juvenile court granted both requests.

On January 10, 2012, while Mother remained incarcerated, DCS filed its Petition for Involuntary Termination of the Parent-Child Relationship. Upon her release from prison on January 17, 2012, Mother was admitted to LaRue Carter Memorial Hospital, where she received treatment for schizophrenia. On February 3, 2012, the juvenile court held an initial hearing on the termination petition. Mother was unable to appear because she was still in LaRue Carter, so the juvenile court continued the hearing until February 24, 2012. Despite being released from LaRue Carter and notified of the hearing, Mother did not appear for the

---

[4] It appears from the record that Mother violated her parole by committing residential entry at her sister's home.

5

February 24 hearing, and the matter was continued until March 9, 2012. Mother appeared for the March 9 hearing, and the juvenile court entered a denial on her behalf and appointed a public defender.

On May 30, 2012, the juvenile court conducted an evidentiary hearing on the termination petition. At the hearing, Mother denied that she had been diagnosed with any mental health problems and testified that she was sent to LaRue Carter because she was homeless and pregnant.[5] Mother admitted being prescribed Haldol in the past and that she had been prescribed Thorazine and Lipotal at LaRue Carter, but stated that she did not fill those prescriptions upon her release. Mother also testified that she was participating in parenting classes and counseling, both of which she paid for herself. Mother testified that she had not been ordered to complete parenting classes, but indicated that she had begun parenting classes on her own approximately three weeks before the termination hearing and had completed only two classes. Mother did not receive these services through DCS, and she did not present any evidence documenting her participation in parenting classes. Mother testified that she had signed up for counseling the week before the termination hearing and had not yet had any sessions. Mother indicated that she was going to the counselor for "a short visit" because she need to "get over [her] past and all the Courts" and "mov[e] on." *Transcript* at 15.

Houston also testified at the termination hearing and indicated that Mother "danc[ed] around" the issue of her mental illness during the mental health assessment. *Id.* at 33.

---

[5] Mother's pregnancy ended in a miscarriage.

6

Houston testified that Mother avoided questions and denied having a history of mental illness and being prescribed medications. Houston testified further that he observed Mother exhibit a number of psychotic symptoms during the interview, including an affect incongruent with her mood, a rigid thought process, and describing bizarre experiences. Mother stated to him that everyone around her was "disgusting and immoral," but she was unable to describe what that meant. *Id.* at 36. Houston also testified that he administered a psychological assessment designed to evaluate mother's parenting and child-rearing attitudes. Houston summarized the results of the assessment as follows:

> [Mother] is a high risk for low levels of empathy, restricting power and independence, and reversal of family roles. An individual scoring high risk for these categories may have difficulties handling the stress of parenting and lack nurturing skills. Parents scoring high risk for low empathy may find it much easier to hit a child rather than discipline them. [Mother's] scores suggest she may not understand children's needs or holds little value regarding their needs. She may also be at a high risk for having enmeshed boundaries with her children and using them to meet her own needs. Individuals scoring high risk for restricting power and independence in children may exhibit unrealistic expectations of childhood obedience and use physical threats to enforce obedience.

*Exhibit Volume* at 191. Houston was of the opinion that Mother had "no insight into . . . the difficulties she was struggling with." *Transcript* at 46.

FCM Harrison also testified at the termination hearing. She testified that Mother had not completed a parenting assessment and that Mother's home-based therapy was terminated unsuccessfully just before Mother went back to jail in October 2011 because Mother "was not successfully participating" and "they were mainly just transporting [her] to visits and back." *Id.* at 69. FCM Harrison also testified that Mother's supervised visitation had been

7

suspended. FCM Harrison testified that she had to refer Mother for a comprehensive mental health assessment twice, but that Mother had completed the assessment. FCM Harrison was unable to refer Mother for the psychiatric evaluation recommended as a result of the mental health assessment because Mother went back to jail. FCM Harrison testified further that Mother had admitted to being diagnosed with schizophrenia at one point, but that she was "in complete denial now." *Id.* at 58. FCM Harrison testified further that Mother had left threatening messages for her and her supervisor, and was of the opinion that Mother's untreated mental illness posed a risk to T.J.'s safety. FCM Harrison stated that T.J. was very bonded to her foster mother, who wants to adopt T.J.

Finally, GAL Jamie Walden testified. GAL Walden testified that Mother became agitated when she brought up her mental health issues and refused to talk about them. Mother denied having been diagnosed with schizophrenia and told GAL Walden that she "just needed a little bit of therapy" and that she would "do one session and then move on." *Id.* at 87. GAL Walden testified further that Mother stated that she was not responsible for the removal of her children and that other people were always lying about her.

At the conclusion of the hearing, the juvenile court took the matter under advisement. On June 4, 2012, the juvenile court entered its judgment terminating Mother's parental rights to T.J. Mother now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable

inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made detailed findings in its order terminating Mother's parental rights to T.J. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the

9

parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw through end of 2011 1st Regular Sess.).[6] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw through end of 2011 1st Regular Sess.)).  If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  I.C. § 31-35-2-8 (West, Westlaw through end of 2011 1st Regular Sess.).

On appeal, Mother challenges the sufficiency of the evidence supporting the juvenile

---

[6] We observe that I.C. § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

court's findings as to subsection (b)(2)(B) of the termination statute cited above.[7] *See* I.C. § 31-35-2-4(b)(2). We first note DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in T.J.'s removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to T.J.'s well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in T.J.'s removal or continued placement outside Mother's care will not be remedied.[8]

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there

---

[7] Mother does not challenge the sufficiency of the evidence supporting the juvenile court's findings regarding the remaining elements of Indiana's termination statute, including whether the child was removed from Mother's care for the requisite amount of time, whether termination of parental rights is in T.J.'s best interests, and whether there is a satisfactory plan for the future care and treatment of the child. *See* I.C. § 31-35-2-4(b)(2)(A), (C), and (D). Mother has therefore waived appellate review of these issues. *See Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied*.

[8] Accordingly, we need not address Mother's arguments with respect to the juvenile court's finding that there was a reasonable probability that continuation of the parent-child relationship poses a threat to T.J.'s well-being.

is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

Mother argues that the sole reason for T.J.'s removal, i.e., Mother's incarceration, was remedied by the time of the termination hearing because Mother had been released and there was no evidence that she would be incarcerated again in the future. We have previously explained, however, that the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

The juvenile court made the following relevant findings:

6. [Mother] was released from prison in July of 2011. Court ordered services toward reunification were referred.

7. Services [Mother] was to complete include home based counseling, to undergo a parenting assessment and follow recommendations, and undergo a psychological evaluation.

8. Home based services commenced in August 2011, but ended unsuccessfully

12

due to becoming just transportation for visitation and [Mother's] subsequent re-incarceration due to violating the terms of her parole.

9. A parenting assessment was not referred. Parenting skills became a concern for [DCS].

10. [Mother's] mental health issues were a concern during the CHINS case. She had a prior CHINS case open for a substantial period of time in which she received mental health treatment, and she spent a month at LaRue Carter Memorial Hospital after her release from prison in January 2012.

11. Upon her admission to LaRue Carter, [Mother] presented as having a blunted affect, loose association thought process, and paranoid. Her insight/judgment was deemed questionable.

12. After a month of taking medications, [Mother] was discharged with positive mood, affect, and thought process and content. However, her insight was still judged to be poor and her judgment questionable.

13. While at LaRue Carter[, Mother] was diagnosed with Schizophrenia, Paranoid Type, Episodic with Interepisode Residual Symptoms.

14. [Mother] was discharged with the recommendations of making an intake appointment at a mental health clinic and continue discharge medications for schizophrenia and anxiety. She did not follow up on the recommendations.

15. [Mother] admitted a diagnosis of Schizophrenia to the family case manager.

16. After a second referral, [Mother] completed a comprehensive psychological assessment. Although it was recommended that she receive therapy and complete a psychiatric assessment to be evaluated for anti-psychotic medication, [Mother] did not follow up.

17. [Mother] denied having mental health issues or the need for medications at trial. She has plans to take a therapy session.

18. Whether from rigidity in thinking or a lack of reality, [Mother's] testimony and her statements to at least one service provider, the family case manager and Guardian ad Litem evidences that [Mother] has little or no insight into her problems. She became agitated and angry during the Guardian ad Litem's testimony, and had been angry and threatening to the family case manager.

19.  [Mother] has a history of having independent housing, living with relatives when not incarcerated.  She has maintained appropriate housing for the last three months.

20.  [Mother] receives Social Security Disability in the amount of $812.00, and [T.J.] receives $55.00.  [Mother] has acknowledged that her social security is not a lot to provide for the children.  She has future plans to participate in a jobs program.

21.  There is a reasonable probability that the conditions that resulted in [T.J.'s] removal and continued placement outside the home will not be remedied by her mother.  More than a year has passed since the CHINS matter was filed and home based services, a parenting assessment with recommendation follow up, and mental health services still need to be successfully completed before reunification could occur.  [Mother] did not follow up on mental health recommendations twice during the CHINS case, and the result is the major road block to reunification, being that she has little or no insight into her mental health diagnosis, or other problems standing in the way of reunification.  Instead, she blames others for her problems, and appears confused with the history of the CHINS case and why there is a termination case.

*Appellant's Appendix* at 11-12.

These findings were more than sufficient to support the juvenile court's conclusion that there was a reasonable probability that the reasons for T.J.'s removal *and continued placement* outside Mother's care will not be remedied.   It is evident the juvenile court's conclusion in this regard was based primarily on Mother's failure to meaningfully engage in the services required by the PPP and her denial and lack of insight with respect to her mental health issues.  While Mother made some progress by being released from jail (after being re-incarcerated for a parole violation) and securing stable housing, her denial of her mental health issues and refusal to engage in services designed to address those issues has been constant.  Indeed, at the termination hearing, Mother still denied that she had been diagnosed

14

with schizophrenia or prescribed medication for her illness, despite the introduction of overwhelming evidence to the contrary. Mother did not follow Houston's recommendation that she seek a psychiatric evaluation, and she testified that she did not continue taking her prescriptions after being released from LaRue Carter. Mother testified further that she first signed up for therapy one week before the termination hearing and had not yet attended a session, and she told GAL Walden that she intended to go to only one therapy session. Mother also failed to successfully complete home-based therapy or a parenting assessment.

Despite these findings, Mother argues that she should have been given more time to engage in services, arguing that "[s]ervices and visitation were terminated after approximately two months." *Appellant's Brief* at 7. The CHINS proceedings in this matter commenced in April 2011, and the termination proceedings began in January 2012, culminating in the termination hearing on May 30, 2012. Thus, the proceedings leading up to the termination spanned over a year. We acknowledge that Mother spent the majority of this time incarcerated. This court has repeatedly recognized, however, that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *See, e.g., Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*.

Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Throughout the course of the proceedings, Mother made no lasting progress toward recognizing and effectively

15

addressing her mental health issues, and continued to deny at the termination hearing that she suffered from mental health problems. Moreover, during the two- or three-month period Mother was not incarcerated or otherwise confined, Mother did not participate successfully in home-based therapy. The juvenile court could reasonably infer that this pattern would continue even if Mother were given additional time. Additionally, the juvenile court's decision to terminate Mother's parental rights was not, as Mother contends, based solely on the fact that Mother suffered from a mental illness—rather, it was based on Mother's failure to successfully complete services and follow recommendations, including those related to addressing her mental health issues, and her continued denial and lack of insight into her mental health issues. Mother's arguments that she made progress toward reunification by completing her prison sentence, obtaining a stable home, and enrolling in counseling and parenting classes are simply requests to reweigh the evidence, which we will not do on appeal.

Mother also takes issue with the juvenile court's finding number 8 on appeal, arguing that it is "vague and erroneous[.]" *Appellant's Brief* at 7. Specifically, Mother argues that the juvenile court's finding that home-based services were terminated unsuccessfully in part because of Mother's incarceration contradicts FCM Harrison's testimony that home-based services were discontinued before Mother went back to jail. FCM Harrison did testify that home-based therapy was terminated "right before [Mother] went to jail." *Transcript* at 53. Later in her testimony, however, and in response to the court's question, "Did home[-]based therapy terminate because of the incarceration?", FCM Harrison stated "That and because she

16

was not successfully participating." *Id.* at 69. In light of this testimony, we cannot conclude that the juvenile court's finding that Mother's incarceration contributed to the termination of home-based services was clearly erroneous. In any event, we are at a loss as to how a finding that services were terminated *prior* to Mother's re-incarceration, based solely on her failure to meaningfully engage in those services, would have altered the juvenile court's ultimate conclusion.

Mother also argues that "[t]here was no testimony from any witness with personal knowledge concerning why home based services or visitation was ended." *Appellant's Brief* at 7. Mother claims than FCM Harrison testified that she received recommendations from the home-based therapist and visitation coordinator that these services should be terminated, but that her testimony as to the reasons these recommendations were made was not admitted for the truth of the matter asserted.

In support of this assertion, Mother directs our attention to a portion of the transcript that is relevant only to the question of why visitation was suspended. Specifically, when FCM Harrison testified that she sought suspension of Mother's supervised visitation based on the visitation supervisor's reported concerns with mother's parenting skills, Mother raised a hearsay objection. The trial court allowed the testimony, but indicated that it would not consider FCM Harrison's testimony in this regard for the truth of the matter asserted. As an initial matter, we note that the juvenile court made no findings concerning the suspension of Mother's visitation, so it does not appear that the juvenile court considered the reasons for the suspension in its decision to terminate Mother's parental rights. Moreover, the record

contains substantive evidence of the reasons why visitation was suspended. The juvenile court's order suspending Mother's visitation was admitted into evidence with no restrictions on its use. The order indicates that DCS sought suspension of visitation because Mother was "verbally abusive and is in and out of jail and is not taking her medication for schizophrenic [sic]." *Exhibit Volume* at 51. Mother does not challenge the admission of the affidavit on appeal.

With respect to home-based therapy, Mother has not directed our attention to any portion of the record indicating that FCM Harrison's testimony with respect to the reasons why services were terminated was admitted for limited purposes. In response to the court's questions, and without objection from Mother, FCM Harrison testified that services were terminated because Mother was not "successfully participating" and was using the services primarily as a mode of transportation to and from visitation, and because mother was re-incarcerated. *Transcript* at 69. Thus, the juvenile court's finding that home-based services were terminated because they had become "just transportation for visitation" is not clearly erroneous. *Appellant's Appendix* at 11.

This court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.